IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN ROMANO, <br> In her individual capacity, <br> and legal guardian of minor child, <br> SIERRA CARDWELL <br>         Plaintiff <br><br> V. <br><br> CHRISTOPHER S. YOUNG, <br> DEAN CERAUL and <br> PLAINFIELD TOWNSHIP <br>         Defendant | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | CIVIL ACTION <br><br> No. 07-cv-1708 |

MEMORANDUM OPINION AND ORDER

GOLDEN, J.                                                                                      MARCH 27, 2009

      Plaintiff, Karen Romano ("Romano") brought this civil rights action under 42 U.S.C. § 1983, on behalf of herself and her minor child, Sierra Cardwell ("Cardwell"), claiming that Cardwell was sexually assaulted on numerous occasions by Defendant Christopher S. Young ("Young"), a former Plainfield Township police officer. Plaintiff has also filed a § 1983 claim against Defendant Dean Ceraul ("Ceraul"), the Chief of the Plainfield Township Police Department and against Plainfield Township for, inter alia, failing to verify Young's credentials before hiring him, failing to prevent Young from committing the alleged sexual acts and failing to adopt or maintain proper policies and procedures.

      The amended complaint consists of five counts brought under 42 U.S.C. § 1983 and four state law counts. Count One is asserted against Young under § 1983 for violation of

Cardwell's substantive due process rights under the Fourteenth Amendment. Counts Two through Five are asserted against either Ceraul or Plainfield Township under § 1983 for violations of Cardwell's civil rights. Count Six is a state law claim asserted against Young for intentional infliction of emotional distress. Count Seven is a state law claim asserted against Young for assault and battery. Count Eight is a state law claim asserted against Young and Ceraul for defamation and Count Nine is a state law claim asserted against Young and Ceraul for invasion of privacy. Presently before the Court is the motion of Young for partial summary judgment as to Counts One and Seven of the amended complaint and the motion of Ceraul and Plainfield Township for summary judgment. The Court held oral argument on these motions on February 19, 2009. For the reasons which follow, both motions will be granted.

      Young was employed by Plainfield Township as a police officer. Complaint at ¶ 11. He was 27 years of age when the alleged incidents took place. Cardwell lived with her mother, stepfather and younger brother. Young and his wife were neighbors of Romano and Cardwell. Id. In fact, the Romano family and the Young family were friends, routinely visited each other, had picnics together and celebrated holidays together. Cardwell Dep. at 22; Young Dep. at 283. The Romanos and the Youngs socialized with each other approximately 100 times in a year. Young Dep. at 283. Cardwell knew Young was a police officer. Young and Cardwell had sexual relations approximately five times beginning in May of 2005 through August of 2005. Cardwell was 14 years of age at the time of the first sexual episode. She turned 15 years of age on July 15, 2005. Prior to the first sexual episode with Young in May of 2005, Cardwell had been sexually active with two different teenage boys and was in fact already pregnant. Cardwell Dep. at 12, 16-20, 55.

On the evening of December 31, 2004, Romano and her husband went out to celebrate New Year's Eve. Because Cardwell and three female friends were at the Romano house alone, the Romanos requested that Young stop by to check on Cardwell and her friends. Young Dep. at 188,192; Rohn Dep. at 28. Young drove his police truck to the Romano residence, arriving at approximately 12:00 a.m. He was in full uniform, with his badge displayed and his service revolver in his waistband. Cardwell Dep. at 226. He also had a tattoo of a K-9 dog on his arm. Id. at 224. Young made a number of sexual remarks to each of the girls and at one point, inappropriately grabbed Cardwell's buttocks and breasts. Cardwell Dep. at 47.[1]

In May of 2005, Cardwell attended a party at Young's home. Young and Cardwell were sitting around a camp fire in Young's backyard when Cardwell decided she wanted marshmallows. At approximately 10:00 p.m., Young offered to take her to a local grocery store in his blue pick-up truck. On the way back, Young stopped at a gas station and began to kiss Cardwell. He then asked her to perform oral sex on him. Cardwell complied. Pennsylvania State Police Incident Report ("PSPIR") at 2. Young was off-duty, not in uniform and wearing mesh shorts during this encounter. Cardwell Dep. at 34-38.

A few weeks later, Young called Cardwell and picked her up at her house, in his blue pick-up truck at approximately 2:00 a.m. Cardwell Dep. at 56. Young drove to a nearby housing development, parked his truck and had intercourse with Cardwell. PSPIR at 4. Young was off-duty, not in uniform and was wearing shorts at the time of this episode. Cardwell Dep. at 57.

---

[1] Although this December 31, 2004 incident is not plead in the amended complaint, it was uncovered through discovery.

On July 4, 2005, Young attended a picnic at Cardwell's home. Young and Cardwell left the party in Young's Mustang to get beer. Young again drove to the housing development and parked the car. He subsequently received oral sex from Cardwell inside the car. Young was off-duty, not in uniform and wearing shorts at the time of this encounter. PSPIR at 3.  Young did visibly carry his badge in his shirt pocket. Cardwell Dep. at 221.

One evening in August 2005, Young was off-duty and was the disc jockey at a graduation party for Michael Orchulli. After returning home from the party, Cardwell sent Young a text message and asked Young whether he wanted to go out. In response, Young picked Cardwell up at her home, in his blue pick-up truck, at approximately 4:45 a.m. Young drove to a nearby kidney treatment center and parked his truck. Young and Cardwell had vaginal and oral sex in Young's truck. Young was not in uniform during this episode. Cardwell Dep. at 59.

Later that same month, Young picked Cardwell up at her home, in his blue pick-up truck, at approximately 2 or 3 a.m. Young drove to a nearby farm and parked the truck. Young brought his personal police scanner with him in the truck which he listened to for a while. Cardwell Dep. at 60-61. Young and Cardwell had intercourse in Young's truck. Young was not in uniform and did not make any threats to Cardwell. Id. at 60.

Young testified at his deposition that he never had sexual relations with Cardwell while on police duty, while in his police uniform, while carrying a police issued gun or any other type of police equipment. Young Dep. at 279-280. He further testified that he never had sexual relations with Cardwell in a police vehicle or on public property. Id. Cardwell herself testified that she never had sexual intercourse or performed oral sex on Young when he was in uniform.

Cardwell Dep. at 166-167. Young also testified that he never contacted Cardwell on his police issued telephone or pager. Young Dep. at 280.

From May 15, 2005 until July 31, 2005, Cardwell sent 99 text messages to Young's personal cell phone and made 24 calls to Young's personal cell phone. Cardwell Dep. at 142. In fact, Cardwell testified that she had Young's name saved in her cell phone as "POPO" which was short for police. Id. at 223. She also called Young's home a few times. Id. at 98.

Sometimes Young would wait for Cardwell at her bus stop in his police car with his police dog in the back and ride alongside Cardwell as she walked home from school. Id. at 169, 229. Young once gave Cardwell a t-shirt that said "K-9 police officer on the back" and "police officer" on the front. Id. at 230.

In her diary, Cardwell wrote the following pertinent entries:

> Oh My God you will never guess what happened! I went up to Chris and Bonnies for a little camp fire. And I was complaining that there were no marshmallows. So Chris said he would take me to the store. I didn't think anything of it so I went with him. He was very sexual toward me in a way it felt kind of nice. I always had a crush on him...On the way home he pulled over and started kissing me. I went along with it. Chris asked me to go down on him so I did....He told me not to tell anyone....

Cardwell Diary at 32.

> Oh My God!
> Something crazy happend [sic]. Chris called me and asked if I wanted to go out so I did. We went driving around for a while and just talked. Hes [sic] a really good person to talk to he seems to know everything about me. We went to the new development we just started kissing and one thing led to another and before you knew it he was on top of me. I can't believe I had sex with him. He makes me feel perfect and he was really good. I wonder if he will ever call me again. Its gonna be hard because his age and hes [sic] already taken. Well, will see how everything goes.

Id. at 34.

> ......so he took me for a ride, he pulled over in the same area we had sex the 1st time and started kissing me. He wanted me to go down on him so I did.... We went back to the party and we didn't really talk at all until everyone left. We sat on the swing together and he held my hand telling me I was the perfect girl he would like to marry. He said before he left for me to call him....

Id. at 37-38.

> Once I got to the party everything was ok. I made myself known to Chris....Once I got home I texted him and asked if he wanted to go out....I really wanted to go out.....He came to pick me up and he reaked [sic] like a alcohol so bad....We went back by my old school in the woods. It wasn't as good as the 1st time but it was good. I really like him. I look at him like one of my boyfriends. I know that sounds a little weird but it's true. I'll write back once something exciting happens.

Id. at 39-40.

> OK Something happened. I went out w/ Chris again tonight....We went back by Fullmer's Farm....It was kinda funny because he brought his cop scanner thing....We had sex again, boy he sure did moan.....He even told me he loved me.....

Id at 41.

Nicole Compano, one of Cardwell's closest friends, testified that Cardwell had told her on a couple of occasions that she liked Young. Compano Dep. at 44-45. Compano also testified that she knew Cardwell's relationship with Young made Cardwell "extremely happy." Id. at 45.

Stacy Rohn, another close friend of Cardwell, testified that Cardwell was attracted to Young. Rohn Dep. at 11-12. Rohn also testified that Cardwell would "get like giddy around [Young]. Like she would smile all the time she was around him." Id. at 30.

Kenyon DeLorenzo, Cardwell's cousin and closest friend, testified that Cardwell liked Young, was attracted to him, had a little crush on him and enjoyed having sex with him. DeLorenzo Dep, at 70, 77-78.

Although Cardwell testified at her deposition, that she felt threatened by Young into having sex, Cardwell Dep. at 28-30 (Cardwell testified that Young threatened to put her younger brother in jail if she did not comply) and that she was scared that Young would get her in trouble because he is a cop, id. at 28, the record is completely devoid of any support for this assertion. According to the PSPIR, Cardwell specifically stated that Young had never threatened her. Exhibit 3 at 13. Cardwell never wrote in her diary that Young threatened her or coerced her into having sex. Rohn and Compano both testified that Cardwell never told her that she was forced by Young to have sexual relations. Rohn Dep. at 30; Compano Dep. at 44. DeLorenzo testified that Cardwell never told her that she felt threatened by or was afraid of Young. DeLorenzo Dep. at 27, 37. When asked at her deposition why prior to her deposition she had never told the police or the district attorney that Young had threatened her in any manner, Cardwell was not forthcoming and repeatedly answered, "I don't know" or "I don't remember." Cardwell Dep. at 31-32; 39–40.

Under Fed.R.Civ.P. 56, summary judgment should be granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, 536 n.3 (3d Cir. 1994). The movant bears the initial burden of identifying those portions of the record that fail to demonstrate a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Thereafter, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing

that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Otherwise, "summary judgment, if appropriate, shall be entered." Id. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

In order to establish a claim under 42 U.S.C. § 1983, Plaintiff must show 1) that a violation of a right secured by the Constitution and the laws of the United States occurred and 2) that the alleged deprivation was committed by a person acting under color of state law. Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995). In his motion for partial summary judgment, Young argues that he was not acting or purportedly acting under color of state law, but rather was acting in a solely personal capacity when he had sexual relations with Cardwell. Plaintiff counters that Young used his position and power as a Plainfield Township police officer to prey upon Cardwell's youth and vulnerability in order to commit sex crimes against her.

"If an individual is possessed of state authority and purports to act under that authority, his action is state action." Griffin v. Maryland, 378 U.S. 130, 135 (1964). An officer purports to act under state authority, where the "[m]isuse of power, possessed by virtue of state law is made possible only because the wrongdoer is clothed with the authority of state law." United States v. Classic, et al., 313 U.S. 299, 326 (1941); Gillard v. Smith, 579 F.2d 825, 829 (3d Cir. 1978).

Our Court of Appeals has explained when an off-duty police officer is considered as acting under color of state law:

> If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity. In the same vein, off-duty police officers who purport to exercise official authority will generally be found to have acted under color of state law. Manifestations of such pretended authority may include flashing a badge, identifying oneself as a police officer, placing an individual under arrest, or intervening in a dispute involving others pursuant to a

> duty impose by police department regulations....On the other hand, a police officer's purely private acts which are not furthered by any actual or purported state authority are not acts under color of state law.

Barna v. City of Perth Amboy, 42 F.3d 809, 816 (3d Cir. 1994) (citations omitted).

In Barna, an off-duty police officer and his partner assaulted the officer's brother-in-law. The assault occurred while the officers were off-duty and on private property. The officers were not in uniform, but were carrying police issued revolvers and night sticks. The officers assaulted the victim with their night sticks and thereafter drew their guns and threatened to arrest him. Despite these facts, the Third Circuit held the officers were not acting under color of state law, but were engaged in a purely private dispute. The critical factor was not that the officers used police equipment to perpetrate the assault, but that the assault arose out of the officer's familial and personal affairs.

In a case involving the sexual abuse of minors by a Pennsylvania State Trooper, the Court found that there was no state action. Knowles v. Weeks, 2007 WL 1455888 (M.D.Pa. 2007). In Knowles, the defendant state trooper was assigned to various schools throughout Pennsylvania in order to conduct school bus inspections. The trooper met the victims in this capacity and abused them at his home, at his friend's home, at a township building and at various locations on school property. During the abuse, the trooper wore a uniform with boots laced up to his knees. On at least one encounter, he wore a black belt that a contained a gun-carrier.

The Court found that the defendant's sexual abuse was "a purely private action because it was not police action 'calculated to preserve the peace, protect life and liberty, arrest violators of the law or prevent crime.'" Knowles, at *13, quoting Nonnemaker v. Ransom, 1999 WL 387084 * 3 (E.D. Pa. 1999). The Court found as further proof that the defendant was not

acting or purportedly acting in his official capacity at the time of the abuse the fact that he never wore an actual Pennsylvania State Trooper's uniform, the abuse did not occur during the performance of the defendant's Pennsylvania State Police duties and that the defendant did not display or employ a state-issued firearm.

In a case involving the sexual assault by a police officer of a casual acquaintance, the court found that there was no state action. Jones v. West Point Police Dept., 2008 WL 474413 (W.D.Ky. 2008). In Jones, the plaintiff had met the defendant police officer on three occasions and had engaged in casual conversation with the defendant on at least one of those occasions. One night plaintiff was inebriated and walking in her driveway when she noticed the police officer in his police cruiser at the end of her driveway. The officer was on duty and in uniform. While Plaintiff could not recall the exact details of what happened, she did recall that she was driven by the officer in his cruiser to a local park where she was sexually assaulted by the officer. According to the victim, after the assault, the police officer even responded to an official call to aid a woman who was abandoned on the side of a road. Even under these circumstances, the Court found that the police officer did not act under color of state law when he sexually assaulted the plaintiff.

This Court has repeatedly found that an off-duty officer's actions are purely private when he becomes involved in a dispute "without any evidence of police actions calculated to preserve the peace, protect life and liberty, arrest violators of the law or prevent crime." Pryor v. City of Philadelphia, 2004 WL 603377 at *4 (E.D.Pa. 2004); Halwani v. Galli, 2000 WL 968219 at *3 (E.D.Pa. July 13, 2000) (on-duty uniformed police officer did not act under color of state law because the altercation arose out of a personal dispute and the officer did not arrest or threaten to arrest the plaintiff). Nonnemaker, supra; Hunte v. Darby Borough, 897 F.Supp. 839, 841 (E.D.Pa.

1995)(finding that an officer's alleged assault, by itself could not be characterized as police activity); Strohm v. Shanahan, 1994 WL 315560, at *2-3 (E.D.Pa. 1994)(finding that an off-duty police officer's alleged assault, battery and false arrest arising from a bar brawl were private actions because they arose from a personal dispute); Mimms-Huntley v. City of Philadelphia, 1993 WL 428946, at *3-4 (E.D.Pa. 1993)(finding that acts of violence by a police officer were purely private).

After carefully reviewing the entire record, the Court finds that the facts in Barna, Knowles and Jones are far more indicative of state action than the facts in the case sub judice. Yet, those courts all found there was no state action.

In the case sub judice, Young's sexual relations with Cardwell arose solely out of the ambit of Young's personal pursuits and close ties with Cardwell and her family. It is undisputed that the Romano family and the Young family were friends, routinely visited each other, had picnics together and celebrated holidays together. All of the sexual contacts occurred either during or following parties Young attended in his personal capacity or as the result of phone calls between Young and Cardwell while Young was acting in his personal capacity. It is further undisputed that Young never had sexual relations with Cardwell while on police duty or in his uniform or while carrying a police issued gun or while wearing a badge or in a police vehicle or on public property. Young Dep. at 279-281; Cardwell Dep. at 166-167. In short, none of the contacts between Young and Cardwell arose from police actions "calculated to preserve the peace, protect life and property, arrest violators of the law or prevent crime." Nonnemaker, supra.

The fact that on some of the sexual encounters Young may have had his police badge visible in his shirt pocket or brought his personal police scanner in his truck or one time

11

was in uniform with his badge and revolver visible was merely fortuitous. None of these indicia of state authority <u>enabled</u> Young to get close enough to Cardwell to have sexual relations with her. Cardwell already knew that Young was a police officer as a result of her family socializing with the Youngs.[2] On the contrary, it was Young's close personal relationship with Cardwell's family that enabled Young to have sexual relations with Cardwell. Even at the New Year's Eve party in 2004, when Young appeared in full uniform with his revolver and badge visible, it was Cardwell's mother and stepfather who asked Young to stop by the Romano home to see if Cardwell and her friends were all right. Young Dep. at 192; Nicholas Romano Dep. at 81-82. Significantly, Cardwell's parents did not call the Plainfield Police Department to send a patrol car, but rather asked their neighbor and friend Young to stop by. <u>Id</u>.

In sum, even construing all the facts in the light most favorable to Plaintiff, there simply is no evidence from which a jury could conclude that Young was either acting or purporting to act in his official capacity on any of the occasions when he had sexual relations with Cardwell. While the Court is sympathetic to Plaintiff's plight given Young's apparent predatory ambitions, the fact remains that it was not Young's status as a police officer which led to the sexual relationship with Cardwell, but rather the fact that Young was a neighbor and social acquaintance of Cardwell and her family. As such, the reprehensible actions of Young constituted at most a private tort by a person acting in a purely private capacity.

Plaintiff's failure to establish that Young acted under color of state law requires that the Court grant the motion for summary judgment filed by Ceraul and Plainfield Township as

---

[2] The fact that Cardwell knew that Young was a police officer is not determinative. Mere knowledge that an actor is a police officer is not enough to show action under color of state law. <u>Hunte</u>, 897 F. Supp. at 842 (E.D.Pa. 1995), citing <u>Barna</u>, 42 F.3d at 817.

well. If no constitutional violation by the individual defendant is established, the municipal defendants cannot be held liable under § 1983. See Williams v. West Chester, 891 F.2d 458, 467 (3d Cir. 1989).

Moreover, Plaintiff's § 1983 claims against Ceraul are based on Ceraul's alleged inadequate policies regarding the hiring of Plainfield Township officers. Since Plaintiff has failed to show that Young used his position as a Plainfield Township police officer to facilitate the alleged sexual assaults, the Court must dismiss the claims against Ceraul as well.

Finally, because the Court has entered judgment against Plaintiff on the Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and will dismiss these claims without prejudice. See United Mine Worker v. Gibbs, 383 U.S. 715, 726 (1966).

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREN ROMANO, : | |
| In her individual capacity, : | CIVIL ACTION |
| and legal guardian of minor child, : | |
| SIERRA CARDWELL : | |
| : | No. 07-cv-1708 |
|       Plaintiff : | |
| : | |
|   V. : | |
| : | |
| CHRISTOPHER S. YOUNG, : | |
| DEAN CERAUL and : | |
| PLAINFIELD TOWNSHIP : | |
| : | |
|       Defendant | |

## ORDER

AND NOW, this 27th day of March, 2009, it is hereby ORDERED that the Motion of the Defendant Christopher S. Young for partial summary judgment [Doc. #56] is GRANTED.

Judgment is ENTERED in favor of Defendant Christopher S. Young and against Plaintiff on Count One of the Amended Complaint.

It is further ORDERED that the Motion of Defendant Dean Ceraul and Plainfield Township for Summary Judgment [Doc. #59] is GRANTED.

Judgment is ENTERED in favor of Defendant Dean Ceraul and against Plaintiff on Counts Two and Four of the Amended Complaint.

Judgment is ENTERED in favor of Defendant Plainfield Township and against the Plaintiff on Counts Three and Five of the Amended Complaint.

It is further ORDERED that Counts Six, Seven, Eight and Nine of the Amended Complaint are DISMISSED WITHOUT PREJUDICE.

It is further ORDERED that the Joint Motion of the Defendants for sanctions [Doc. #83] is DENIED as moot.

It is further ORDERED that the motions in limine of the Defendants [Doc. #s 91,92,93,94] are DENIED as moot.

The Clerk is DIRECTED to mark this case closed for statistical purposes.

BY THE COURT:


*/s/ THOMAS M. GOLDEN*
THOMAS M. GOLDEN, J.